UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

       - against -             **19 Cr. 699 (JGK)**

JAMES T. BOOTH,             **ORDER**

             **Defendant.**

JOHN G. KOELTL, District Judge:

The Court received the attached motion for compassionate release from the pro se defendant.

The Government should respond to the motion by **April 22, 2022.** The defendant may reply by **May 13, 2022.**

The Clerk's Office is directed to mail a copy of this Order to the defendant's last known address and to note service on the docket sheet.

SO ORDERED.

Dated:    New York, New York
        April 1, 2022

                           John G. Koeltl
                    United States District Judge

James T. Booth
Register No.: 20527-509
FCI OTISVILLE
FEDERAL CORRECTIONAL INSTITUTION
SATELLITE CAMP
P.O. BOX 1000
OTISVILLE, NY  10963

The Honorable John G. Koeltl
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007

Attn: Clerk's Office

Re: Docket 1:19 CR 000699-001 (JGK)

Dear Sir or Madame:

Enclosed please find a filing for my Motion for Compassionate Release in the above referenced case.
Please electronically submit the filing before Judge John G Koeltl.
Thank you for your assistance in this matter

James T. Booth, Petitioner Pro SE

CC Robert L. Boone AUSA SDNY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES T. BOOTH                                    )
                                                  )
                                                  )
          Petitioner                              )
                                                  )
                                                  )          Docket No.: 1:19CR00699-001 (JGK)
                                                  )
v.                                                )
                                                  ) **MOTION FOR COMPASSIONATE RELEASE**
                                                  ) **AND/OR REDUCTION IN SENTENCE AND/OR**
                                                  ) **PLACEMENT IN HOME CONFINEMENT**
                                                  )
WARDEN, W.S. PLILER                               )
FCI OTISVILLE SATELLITE CAMP                      )
                                                  )
          Defendant,                              )

## PETITIONER'S APPEAL OF THE DENIAL OF
## HIS REQUEST SEEKING HOME CONFINEMENT

COMES NOW, James T Booth, Petitioner in the above styled criminal action, and pursuant to the

provisions of 28 CFR 571.61, 18 U.S.C. 3582(c)(1) as amended by the First Step Act (P.L. 115-

391), the applicable provisions of the CARES Act of 2020, Bureau of Prisons Program Statement

P.S. 5050.50 [January 17, 2019] as well as all other applicable portions of the First Step Act, files

this Appeal of the Denial of his Request seeking Home Confinement and/ or Compassionate

Release by the Defendant Warden W. S. Pliler of FCI Otisville-Satellite Camp (hereinafter,

"Warden Pliler").

On or about March 26, 2020, the Office of the United States Attorney General issued a

Memorandum to the Bureau of Prisons [attached herein as Exhibit "A"] requiring the use of

home confinement in appropriate cases by identifying high risk individuals at risk for COVID

and moving them out of the institutional setting. In this context, this inquiry includes, in relevant

part, (1) emphasis on inmates who are vulnerable to contracting Covid in prison based on their

medical history, (2) giving priority to those who are located in low and minimum security

facilities, (3) allowing deference to those who are scored as a minimum risk and, (4) giving

priority to those inmates whose release would lower their individual risk of contracting Covid.

The implementation of this process was subsequently clarified by the Attorney General's Office on April 3, 2020 in a follow up Memorandum [attached herein as Exhibit "B"] requiring the BOP to immediately prioritize home confinement as an appropriate response to the current pandemic. In this Memorandum, the Attorney General also advised the BOP to immediately process suitable candidates out of the prison setting as soon as possible.

The Petitioner contends, in whole or in part, that he has met all the relevant legal and/or administrative standards necessary to be granted Home Confinement and/or Compassionate Release but that his request was summarily denied and/or ignored without proper investigation and/or consideration by, Warden Pliler.

Therefore, the Petitioner respectfully requests that this Honorable Court review all of the facts and circumstances concerning the matter and modify his sentence to allow him to serve the remainder on Home Confinement or, in the alternative, that the Court grant him Compassionate Release.[1]

## I.        **__INTRODUCTION__**

On or about January 19, 2021, this Court denied Petitioner's motion for compassionate release or an order requiring that the Petitioner serve his sentence in home confinement based on the Petitioner's medical conditions and the existence of the COVID-19 pandemic on the grounds the Petitioner had not yet reported to Bureau of Prisons custody, and therefore had not availed himself of the proper administrative procedures under the CARES Act, and 18 U.S.C §3582 (c)(1)(A)(i).

---

[1] All seven court of appeals to decide the issue—plus a "majority of district courts"—have held that U.S.S.G. § 1B.13 is no longer an applicable policy statement when a district court considers a Petitioner-filed § 3582(c)(1)(A) motion. *See United States v. Brooker*, No. 19-3218-CR, 2020 WL 5739712, at *7 (2d Cir. Sept. 25, 2020); *United States v. Jones*, 2020 U.S. App. LEXIS 36620 (6th Cir. Nov. 22, 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020); *United States v. McGee*, No. 20-5047, 2021 WL 1168980, at *12 (10th Cir. Mar. 29, 2021); *United States v. Shkambi*, No. 20-40543, 2021 WL 1291609, at *4 (5th Cir. Apr. 7, 2021); *United States v. Aruda*, No. 20-10245, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021).

On June 6, 2021, Petitioner reported to FCI Otisville Satellite Camp to serving the forty-two month sentence imposed by this Court. On or about January 10, 2022  Petitioner properly filed a Request for Home Confinement and/or Compassionate Release and/or a Reduction in Sentence [RIS] pursuant to the provisions of the CARES Act, other related provisions of 28 CFR 571.61, 18 U.S.C. 3582(c)(1), Bureau of Prisons Program Statement P.S. 5050.50 [January 17, 2019]  and the U.S. Department of Justice Memorandum concerning Home Confinement issued on April 13, 2021 [attached herein as Exhibit "C"],  as well as all other applicable portions of the First Step Act with Warden Pliler.

The answer by Warden Pliler issued to the Petitioner by the Warden Pliler on or about February 24, 2022 articulated his reasons for his denial to Petitioner2021 [attached herein as Exhibit "D"]. However, Warden Pliler's denial to Petitioner clearly failed to properly take into account all the substantive factors as delineated in the Department of Justice's Memorandum on of April 13, 2021 (the "Memorandum of April 13th"). The failure of Warden Pliler to set forth in his denial the factors listed in the Memorandum of April 13th appears, on its face, as an action taken purposefully in bad faith by him and his medical staff so not to avail Petitioner of his rights thereunder. In consideration of these circumstances and the right to bring a motion pursuant to 18 U.S.C. §3582 (c) (1) (A), the Petitioner submits to the Court this Motion for Compassionate Release and/or Reduction in Sentence.

## II.                                  ARGUMENT

### A. EXTRAORDINARY AND COMPELLING CIRCUMSTANCES EXIST IN THIS CASE WHICH JUSTIFY A MODIFICATION OF SENTENCE

Pursuant to 18 U.S.C. § 3582, a court may modify a term of imprisonment where "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). The Memorandum of April 13th issued jointly by the Correctional Programs Division, the Reentry Services Division and the Health Services Division of the Federal Bureau of Prisons states, "*In our*

3

*ongoing effort to protect the health and safety of staff and inmates during the COVID-19 pandemic,*
*it is imperative to continue to reviewing at-risk inmates for placement on confinement in*
*accordance with The CARES Act and guidance from the Attorney General.*" The Memorandum of
April 13[th] sets forth the eight (8) factors to determine inmates suitable for home confinement under
the CARES Act.

In this case, the Petitioner application to Warden Pliler provided sufficient information to
show that he has met the factor to be assessed to ensure inmates are eligible for home confinement
under the CARES Act.  These factors, although listed by Warden Pliler in his denial, were not
analyzed or applied to Petitioner or his record.

These factors as set forth in the Memorandum of April 13th are: (1) ***Reviewing the inmate's***
***institutional discipline history for the last twelve months.*** Petitioner has received no institutional
disciplinary action during his entire time in Federal custody; (2) ***Ensuring the inmate has a***
***verifiable release plan.*** Petitioner will be released to the care of his loving wife and son at their
home, located at 5 Green Hill Road,  Norwalk CT 06850 and whose phone number is 203-246-
6984. This stable home environment allows Petitioner to shelter in place and practice social
distancing as mandated by public health experts. This residence has already been approved by the
USPO and is listed in Petitioner's PSR. See Booth's PSR at p. 2; (3) ***Verifying the inmate's***
***primary offense is not violent, a sex offense, or terrorism-related.*** Petitioner crimes, moreover, do
not include any disqualifying conditions such as violent crimes involving drugs and/or guns, nor
involve any type of sex offense or physical violence nor are they in any way terrorism related; (4)
***Ensuring the inmate is Low or Minimum security.*** Petitioner has a Minimum security level as
evidenced by his designation by the Bureau of Prison at the Otisville Satellite Camp facility; (5)
***Ensuring the inmate has a Low or Minimum PATTERN recidivism risk score.*** Petitioner's
overall recidivism risk score is minimum, with a -13 general score and a violence risk score of -5;
(6) ***Ensuring the inmate has not engaged in violent or gang-related activity while incarcerated.***

4

Here, the Petitioner clearly poses absolutely no danger to the community nor does he pose a risk of reoffending. He is a first-time non-violent offender who led an otherwise exemplary life. He has no history of any type of gang affiliation. During his time incarceration he has not engaged either in violence or any type of gang related activity. Considering Booth's age and his conduct while incarcerated firmly establishes he is not a risk for recidivism and his risk to the public is extremely low.

Furthermore, the remaining two factors to be considered weigh heavily in Petitioner favor.

(7) ***Reviewing the COVID-19 vulnerability of the inmate, in accordance with CDC guidelines;*** Petitioner is at high risk in the prison setting. He is a seventy-seven [77] years-old male who suffers from uncontrolled Type 2 diabetes, hyperlipidemia, hypertension, retinopathy and spinal stenosis. During his time in Federal custody, Petitioner's Hemoglobin A1C, has increased dramatically indicating a worsening of his diabetic condition.  *See* Booth's Medical Records. [attached herein as Exhibit "E"]. These conditions have been identified by the Center for Disease Control [CDC] as posing the greatest risk of complications or death in the event he becomes exposed to COVID-19. Based on his age alone, he is considered to be at high risk for the contraction of COVID-19 as well as other significant illnesses in the prison setting. In this regard, the Center for Disease Control [CDC] has determined that men over the age of 50 who are exposed to COVID-19 have the greatest chance of suffering serious illness and have a much higher mortality rate than any other age groups. We submit the combination of Booth's age, worsening Type 2 diabetes, hypertension and hyperlipidemia rises to the level of "extraordinary and compelling" circumstances necessary for compassionate release. Throughout facilities operated by the BOP, two hundred eighty-eight inmates have now died[2] and the infection rate is 6.5 times higher than the overall average infection rate in the U.S.[3] COVID-19 has now killed more than 2,850 inmates nationwide.[4] Given these grim

---

[2] *See* https://www.bop.gov/coronavirus/
[3] *See* https://www.fd.org/sites/default/files/cja_resources/2020.05.11_letter_from_fd_to_congress.pdf

statistics, the likelihood of Booth contracting COVID-19 in federal prison and experiencing severe complications as a result is alarmingly high; (8) ***Confirming the inmate has served 50% or more of their sentence; or has 18 months or less remaining on their sentence and have served 25% or more of their sentence.*** The BOP has set Petitioner's release date as May 25, 2024. Therefore as of November 24, 2022 Petitioner will have only 18 months remaining on his sentence. Furthermore Petitioner will have completed 50% of his sentence by November 27, 2022. Thus, Petitioner will then meet the eight (8) criteria set by the Federal BOP for Compassionate Release or Home Confinement by these dates.

Although the Petitioner at the time of the filing of this motion does not meet the exact criterion of this factor, given the severity and morbidities suffered by the Petitioner the Court may in its discretion immediately order home confinement and/or compassionate release or the Court may order for the Petitioner to be release on or about November 27, 2022 when Petitioner will completely meet both the 50% completion and 18 months remaining on sentence conditions.

Furthermore, Petitioner will also qualifies under the First-Step Act's Elderly Inmates with a Medical Condition provision when he reached the 50% completion date on or about the November 27, 2022 date, as he is over the 65 year old age limit and his medical conditions as delineated herein are chronic, serious and related to the aging process.

### B. COMPASSIONATE RELEASE IS JUSTIFIED IN THIS CASE

District courts across the country have recognized that ordering release or home confinement pursuant to 18 U.S.C. § 3582 is warranted when an inmate with specified underlying medical conditions is faced with incarceration during this COVID-19 health crisis.[5]

---

[4] *See* https://covidprisonproject.com/
[5] *United States v. Muniz*, No. 09-cr-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020) (releasing Petitioner serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); See Also *United States v. Campagna*, No. 16-cr- 78-01, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) ("Petitioner's compromised immune system, taken in concert with the COVID-19

As the Court is well-aware, the coronavirus pandemic is a global crisis which is causing death and illness within the prison system due to the inherent impossibility of social distancing, the limited ability of prison officials to take preventative measures and the difficulties in providing and receiving adequate medical treatment in confinement. On February 18th of this year, the President of the United States issued a letter to the Speaker of the House and the President of the Senate giving notice that the COVID-9 pandemic emergency is to continue in effect [attached herein as Exhibit "F"].

When considering a sentencing modification request, including compassionate release, the Court must consider the sentencing factors of 18 U.S.C. § 3553(a) and must also find that a sentence modification is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The requirement that the sentence modification be consistent with U.S. Sentencing Commission policy "is essentially already met if "extraordinary and compelling reasons" exist as defined by that policy." See *United States v. Ebbers*, 2020WL91399, at *6 (S.D.N.Y. Jan. 8, 2020).

Furthermore, the Petitioners medical condition[s] clearly meets the definition of "extraordinary and compelling" circumstances due to the unprecedented health crisis facing the federal prison system.

In addition, the Petitioner clearly meets the criteria that set forth in the Memorandums from the Department of Justice to the Bureau of Prisons. Finally, in consideration of the safety risk of releasing the Petitioner as well as the applicable sentencing factors, it is evident that reducing his sentence to home confinement would be entirely consistent with these factors and policies.

The Petitioner has access to a home that will allow him to shelter in place and practice social distancing mandated by public health experts. Furthermore, in the Petitioner's case, with

public health crisis, constitutes an extraordinary and compelling reason to modify to Petitioner's sentence

his serious medical conditions, being able to practice prevention measures at home will be essential, especially given the immediate access to medical care if necessary. The Petitioner also has the ability to obtain full health insurance coverage for his medical conditions if he is granted Compassionate Release.

Allowing the Petitioner to serve out his sentence on Home Confinement and/or Compassionate Release will clearly be sufficient to accomplish the statutory purposes of sentencing and will remain a deterrent. Consequently, modifying the Petitioner's judgment by allowing him to serve his sentence on Home Confinement and/or Compassionate Release would be consistent with the sentencing factors of 18 U.S.C. § 3553(a) as well as the U.S. Sentencing Commission guidance as well.

Keeping the Petitioner in the prison setting puts him substantial risk of exposure to COVID-19 and/or its variants which could cause him great physical harm and possibly even death. It's simply not proportional given the all of the circumstances.

Allowing the Petitioner to serve out his sentence on home confinement will be sufficient to accomplish the statutory purposes of sentencing and will remain a deterrent. For these reasons, modifying the Petitioner's judgment by allowing him to serve his sentence on home confinement or ordering compassionate release would be consistent with the sentencing factors of 18 U.S.C. § 3553(a) and U.S. Sentencing Commission guidance.

### III. CONCLUSION

It is clear here the Warden and/or BOP officials failed to properly look into the claims raised by the Petitioner in his request for Home Confinement and/or Compassionate Release. There is simply no evidence whatsoever that the BOP properly evaluated the Petitioner's request, considered his medical conditions or evaluated the matter at all. This certainly makes it appear that the decision of the Warden was not only arbitrary and capricious but has also served to deny the Petitioner his rights to both substantive and procedural due process in this case.

Therefore, pursuant to the provisions of 28 CFR 571.61, 18 U.S.C. 3582(c)(1) as amended by the First Step Act (P.L. 115-391), the applicable provisions of the CARES Act of 2020, Bureau of Prisons Program as well as all other applicable portions of the First Step Act and the Memorandums of the Department of Justice, the Petitioner respectfully requests that this Court grant his appeal and enter an Order modifying his sentence to allow him to serve his sentence on Home Confinement or, in the alternative, that he be granted Compassionate Release.

Respectfully submitted this 28 TH day of MARCH , 2022.

James T. Booth Pro Se [by express permission]
Register No.:87217-054
FCI OTISVILLE
FEDERAL CORRECTIONAL INSTITUTION
SATELLITE CAMP
P.O. BOX 1000
OTISVILLE, NY  10963

# EXHIBIT A



**Office of the Attorney General**
**Washington, D. C. 20530**

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:            THE ATTORNEY GENERAL

SUBJECT:      <u>Prioritization of Home Confinement As Appropriate in Response to
COVID-19 Pandemic</u>

Thank you for your tremendous service to our nation during the present crisis. The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times. We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe. At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

**I.    TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH**

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances. I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

Memorandum from the Attorney General                                          Page 2
Subject: Prioritization of Home Confinement As Appropriate in Response to COVID-19
          Pandemic

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.   **PROTECTING THE PUBLIC**

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.

# EXHIBIT B



**Office of the Attorney General**
**Washington, D. C. 20530**

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:       THE ATTORNEY GENERAL

SUBJECT:    <u>Increasing Use of Home Confinement at Institutions Most Affected by COVID-19</u>

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

**I.    IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**

Memorandum from the Attorney General                                          Page 2
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.   <u>PROTECTING THE PUBLIC</u>

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                         Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

     The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

     I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

# EXHIBIT C



**U.S. Department of Justice**
**Memorandum**
Federal Bureau of Prisons

_Central Office_

_Washington , DC  20534_

April 13, 2021

**MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS**

**FROM:**     **ANDRE MATEVOUSIAN, ASSISTANT DIRECTOR**
**CORRECTIONAL PROGRAMS DIVISION**

**SONYA D. THOMPSON, ASSISTANT DIRECTOR**
**REENTRY SERVICES DIVISION**

MICHAEL SMITH   Digitallysignedby MICHAEL SMITH
Date: 2021.04.13  16:01 :39 -04'00'

**M. D. SMITH, ASSISTANT DIRECTOR**
**HEALTH SERVICES DIVISION**

**SUBJECT:**     **HOME CONFINEMENT**

In our ongoing effort to protect the health and safety of staff and inmates during the COVID-19 pandemic, it is imperative to continue reviewing at-risk inmates for placement on home confinement in accordance with the CARES Act and guidance from the Attorney General. This memorandum provides updated guidance and direction and supercedes the memorandum dated November 16, 2020.

The following factors are to be assessed to ensure inmates are suitable for home confinement under the CARES Act:

- Reviewing the inmate's institutional discipline history for the last twelve months (Inmates who have received a 300 or 400 series incident repo1t in the past 12 months may

be referred for placement on home confinement. if in the Warden's judgement such placement does not create an undue risk to the community);

- Ensuring the inmate has a verifiable release plan;
- Verifying the inmate's primary offense is not violent, a sex offense, or terrorism-related;
- Confirming the inmate does not have a current detainer;
- Ensuring the inmate is Low or Minimum security;
- Ensuring the inmate has a Low or Minimum PATTERN recidivism risk score;
- Ensuring the inmate has not engaged in violent or gang-related activity while incarcerated (must be reviewed by SIS);
- Reviewing the COVID-19 vulnerability of the inmate, in accordance with CDC guidelines; and
- Confirming the inmate has served 50% or more of their sentence; or has 18 months or less remaining on their sentence and have served 25% or more of their sentence.

Additionally, pregnant inmates should be considered for viability of placement in a community program to include Mothers and Infants Together (MINT) programs and home confinement.

If the Warden determines there is a need to refer an inmate for placement in the community due to COVID-19 risk factors who is outside of the criteria listed above, they may forward the home confinement referral to the Correctional Programs Division for further review.

Referrals to a Residential Reentry Management (RRM) Office must be made based on appropriateness for home confinement. This assessment should include verification that the conditions under which the inmate would be confined upon release would be more effective in protecting their health than continued confinement at their present place of incarceration.

To this end, the inmate must be provided education on CDC guidance on how to protect themselves and others from COVID-19 transmission. This education includes, but is not limited to: hand washing, social distancing, wearing of facial coverings and self-assessment for signs and symptoms of COVID-19. Inmates should understand how home confinement provides the opportunity to practice optimal infection control measures, which may mitigate existing risks, based on rates of transmission in the local area, and exercising best practices. The information (education) provided to the inmate must be documented on the BEMR exit summary.

All referrals should clearly document the review of the following items prior to being submitted to the RRM office:

- Specific type of release residence (House/Apt/Group Home etc.);
- List of individuals with whom inmate will be living;
- Any health concerns of individuals in the residence;
- Contact phone numbers of the inmate should he/she be placed on home confinement; and,
- Transportation plan as to how the inmate will be transferred to the home confinement location.

Any questions as to eligibility in relation to the release plan will be referred to the Residential Reentry Management Branch Administrator.

Inmates determined to have a viable release residence will be further screened by Health Services and a determination made as to whether they require frequent and ongoing medical care within the next 90 days.  If frequent and on-going medical care is required then:

- Health Services staff will coordinate with RRMB's Health Services Specialists to determine if the inmate's medical needs can be met in the community.  RRMB will establish follow-up care prior to inmate transfer.  The inmate must transfer with at least 90 days o f any prescribed medications.
- If the inmate's medical needs cannot be met in the community, then the inmate will remain at his/her current institution.  (If the inmate does not require frequent and on-going medical care then the referral will be processed.)

If an inmate is referred or denied for home confinement once a review is completed, the appropriate Case Management Activity (CMA) assignment should be loaded.

Case Management Coordinators must track all inmates determined to be ineligible for CARES Act home confinement or the Elderly Offender Home Confinement Pilot Program and ensure the appropriate denial code is entered in SENTRY.  Reports outlining the reason for denial must be submitted to the Correctional Programs Administrator in the appropriate Regional Office.

If an inmate does not qualify for CARES Act home confinement under the above criteria, they should be reviewed at the appropriate time for placement in a Residential Reentry Center and/or home confinement consistent with applicable laws and BOP policies.

If you have any questions, please contact, David Brewer, Administrator, Correctional Programs Branch.

# EXHIBIT D

**Response to Inmate**

Inmate name: Booth, James T
Reg. No.: 87217-054
Unit: Camp

---

This is in response to a third party request for a Reduction in
Sentence (RIS) or Home Confinement based on concerns about COVID-19.
Specifically, the request states that you have a medical history
which places you at an increased risk of serious health complications
if exposed to COVID-19.  A review of your medical records, by Health
Services, revealed you have a history of Type 2 diabetes mellitus and
smoking.  Although you have medical conditions that are listed by the
Center for Disease Control as risk of serious illness should you be
exposed to COVID-19, these medical conditions are not terminal or
debilitating in nature and are being managed effectively at the
present time.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a
sentencing court, on motion of the Director of the BOP, to reduce a
term of imprisonment for extraordinary or compelling reasons.  BOP
Program Statement No. 5050.50, Compassionate Release/Reduction in
Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A)
and 4205(g), provides guidance on the types of circumstances that
present extraordinary or compelling reasons, such as the inmate's
terminal medical condition; debilitated medical condition; status as
a "new law" elderly inmate, an elderly inmate with medical
conditions, or an "other elderly inmate"; the death or incapacitation
of the family member caregiver of the inmate's child; or the
incapacitation of the inmate's spouse or registered partner.  Your
request has been evaluated consistent with this general guidance.

Additionally, Prioritization of Home Confinement As Appropriate in
Response to COVID-19 Pandemic, directs the Federal Bureau of Prisons
to consider the totality of circumstances for each individual inmate
in assessing which should be granted home confinement.  Specifically,
priority should be given to inmates who have served 50% or more of
their sentence, or 25% with less than 18 months remaining to serve.
Inmates are assessed by disciplinary history for the last twelve
months, verifiable re-entry plan, primary or prior offense history
does not include violence, a sex offense, or terrorism related, no
detainer, low or minimum security level, low or minimum PATTERN
recidivism risk, not involved in violent or gang-related activity
while incarcerated, and vulnerability of the inmate to COVID-19, in
accordance with the CDC guidelines.  Based upon a review of your
request, you do not meet the criteria of this general guidance.

The BOP is taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates.  We recognize that you, like all of us, have legitimate concerns and fears about the spread and effects of the virus.  However, based on the above information, you do not currently warrant an early release from your sentence or placement on Home Confinement, at this time.

If you are not satisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, U.S. Custom House, 2nd and Chestnut Street, Philadelphia, Pennsylvania, 19106, within twenty (20) calendar days of the date of this response.

_____                    2/23/2022
W.S. Pliler, Warden                              Date

# EXHIBIT E

Name: James T Booth | DOB: 3/28/1945 | MRN: 2003772484 | PCP: Charles P Cochran, MD

# HEMOGLOBIN A1C - Details

## Component Results

| Component | Your Value | Standard Range | Flag |
|---|---|---|---|
| Hemoglobin A1C | **Your Value**<br>**8.3** % of total Hgb | *Standard Range*<br>*<5.7 % of total Hgb* | **Flag**<br>**H** |

For someone without known diabetes, a hemoglobin A1c value of 6.5% or greater indicates that they may have diabetes and this should be confirmed with a follow-up test.

For someone with known diabetes, a value <7% indicates that their diabetes is well controlled and a value greater than or equal to 7% indicates suboptimal control. A1c targets should be individualized based on duration of diabetes, age, comorbid conditions, and other considerations.

Currently, no consensus exists regarding use of hemoglobin A1c for diagnosis of diabetes for children.

## General Information

Ordered by Powlimi J Soni, MD

Collected on 01/04/2021 12:00 AM from Blood (Blood)

Resulted on 01/05/2021 5:29 PM

Result Status: Final result

This test result has been released by an automatic process.

Name: James T Booth | DOB: 3/28/1945 | MRN: 2003772484 | PCP: Charles P Cochran, MD

## Progress Notes

Powlimi J Soni, MD at 1/8/2021 11:45 AM

**History of Present Illness**

James T Booth is a 75 y.o. male who is being evaluated for
**Chief Complaint**
Patient presents with
 • Diabetes

HPI: He is here for followup of Type 2 Diabetes. He has not been seen since 7/2019 - has
been stressed with legal issues. He admits to significant stress. Taking his medications
consistently. Sugars have been running 150s fasting, PM 150-200s. No lows.

He is planning to report to prison in 1/22 - still not sure where he will be going.
He is sentenced to 42 months (3 years).

3/2013: HbA1c 8.1, TC 178, LDL 93, HDL 70, TG 74, Creatinine 1.1, umca/cr 3, TSH 2.63,
FT4 1.4
7/2013: HbA1c 7.4, TC 185, LDL 95, HDL 77, TG 66, Creatinine 1.1
10/2013: Hba1c 7.6%, LDL 89, creatinine 1.1, TSH 2.076, microalbumin <30, K+ 5.5
1/2014: HbA1c 7.5
5/2014: HbA1c 7.2, TC 169, LDL 67, HDL 89, TG 67, Creatinine 1.0, umca/cr <30, TSH
2.12, FT4 1.12
9/2014: Hba1c 7.7%, Potasium 5.6, LDL 78, TG 70
3/2015: HbA1c 7.8, Creatinine 0.9
7/2015: HbA1c 7.4, TC 183, LDL 90, HDL 81, TG 58, Creatinine 1.0, umca/cr <30, TSH
3.86, FT4 0.88, fructosamine 295
11/2015: HbA1c 7.2, TC 201, LDL 108, HDL 73, TG 100, Creatinine 1.2, umca/cr <30, TSH
2.69, FT4 1.02
4/2016: HbA1c 7.4, TC 174, LDL 82, HDL 81, TG 54, Creatinine 0.9, umca/cr <30, TSH
2.38, FT4 0.88
2/2017: HbA1c 7.6, TC 211, LDL 109, HDL 86, TG 79, Creatinine 1.1, TSH 1.9
6/2017: HbA1c 7.9, TC 158, LDL 72, HDL 72, TG 71, Creatinine 1.2, TSH 3.85, FT4 0.95,
umca/cr <30
12/2017: HbA1c 7.5, TC 171, LDL 73, HDL 87, TG 56, Creatinine 1.2
7/2018: HbA1c 8.5, TC 198, LDL 84, HDL 100, TG 1.84, Creatinine 1.1, TSH 1.84, FT4 0.89
7/2019: HbA1c 8.3, TC 252, LDL 157, HDL 77, TG 91, Creatinine 1.0, TSH 2.94, FT4 0.9,
umca/cr <30

**Lab Results**

| Component | Value | Date |
|---|---|---|
| HGBA1C | 8.3 (H) | 01/04/2021 |
| HGBA1C | 8.0 (H) | 07/16/2020 |

**Lab Results**

| Component | Value | Date |
|---|---|---|
| CHOL | 178 | 01/04/2021 |
| CHOL | 172 | 07/16/2020 |

**Lab Results**

| Component | Value | Date |
|---|---|---|

1/10/2021                           MyChartPLUS - Visit Summary

|  | HDL | 79 | 01/04/2021 |
|  | HDL | 75 | 07/16/2020 |

No results found for: LDLCALC

**Lab Results**

| Component | Value | Date |
|---|---|---|
| TRIG | 74 | 01/04/2021 |
| TRIG | 80 | 07/16/2020 |

No results found for: CHOLHDL

**Lab Results**

| Component | Value | Date |
|---|---|---|
| CREAT | 1.08 | 01/04/2021 |
| CREAT | 1.17 | 07/16/2020 |

**Lab Results**

| Component | Value | Date |
|---|---|---|
| TSH | 4.01 | 01/04/2021 |
| TSH | 2.23 | 07/16/2020 |

**Lab Results**

| Component | Value | Date |
|---|---|---|
| MICROALBUR | 0.5 | 01/04/2021 |

Review of Systems
Review of Systems
Constitutional: Negative for activity change, appetite change, fatigue and unexpected weight change.
Eyes: Negative for visual disturbance.
Respiratory: Negative for cough, choking and shortness of breath.
Cardiovascular: Negative for chest pain, palpitations and leg swelling.
Gastrointestinal: Negative for abdominal pain, constipation, diarrhea, nausea and vomiting.
Genitourinary: Negative for difficulty urinating, dysuria, frequency and urgency.
Musculoskeletal: Negative for arthralgias, back pain, joint swelling and myalgias.
Skin: Negative for color change, rash and wound.
Neurological: Negative for dizziness, tremors, weakness, light-headedness, numbness and headaches.
Hematological: Does not bruise/bleed easily.
Psychiatric/Behavioral: Negative for confusion, decreased concentration, dysphoric mood and sleep disturbance. The patient is not nervous/anxious and is not hyperactive.

Medications:

| | |
|---|---|
| • diazepam (VALIUM) 5 MG tablet | TAKE 1 TABLET BY MOUTH TWICE A DAY |
| • glipiZIDE (GLUCOTROL XL) 5 MG 24 hr tablet | Take 4 tablets (20 mg total) by mouth daily. |
| • metFORMIN (GLUCOPHAGE-XR) 500 MG 24 hr tablet | Take 2 tablets (1,000 mg total) by mouth 2 (two) times a day in the morning and the early evening.. |
| • rosuvastatin (CRESTOR) 10 MG tablet | Take 1 tablet (10 mg total) by mouth daily. |
| • sitaGLIPtin (Januvia) 100 MG tablet | Take 1 tablet (100 mg total) by mouth daily. |

**Allergies**

| Allergen | Reactions |
|---|---|
| • Sulfa Antibiotics | Rash/Dermatitis |

History reviewed. No pertinent past medical history.

History reviewed. No pertinent surgical history.

## Family History

| Problem | Relation | Age of Onset |
|---|---|---|
| • Heart failure | Mother | |
| • Chronic Kidney Disease | Mother | |

## Social History

Tobacco Use
- Smoking status:        Former Smoker
- Smokeless tobacco:     Never Used

Substance Use Topics
- Alcohol use:           Not on file
- Drug use:              Not on file

| Physical Exam |
|---|

**Vitals:**

|  | 01/08/21 1153 |
|---|---|
| BP: | (!) 142/68 |
| BP Location: | Right arm |
| Patient Position: | Sitting |
| Cuff Size: | Medium (Standard) |
| Pulse: | 87 |
| Weight: | 74.8 kg (165 lb) |
| Height: | 1.803 m (5' 11") |

Physical Exam
Constitutional: He is oriented to person, place, and time and well-developed, well-nourished, and in no distress. No distress.
HENT:
Head: Normocephalic.
Mouth/Throat: Oropharynx is clear and moist.
Eyes: Conjunctivae and EOM are normal. No scleral icterus.
Neck: Normal range of motion. Neck supple. No tracheal deviation present. No thyromegaly present.
Cardiovascular: Normal rate, regular rhythm, normal heart sounds and intact distal pulses.
Pulmonary/Chest: Effort normal and breath sounds normal. No respiratory distress. He has no wheezes. He exhibits no tenderness.
Abdominal: Soft. Bowel sounds are normal. He exhibits no distension and no mass. There is no abdominal tenderness.
Musculoskeletal: Normal range of motion.
   General: No tenderness or edema.
Lymphadenopathy:
   He has no cervical adenopathy.
Neurological: He is alert and oriented to person, place, and time. Gait normal.
Skin: Skin is warm and dry. No rash noted. He is not diaphoretic. No erythema. No pallor.
Psychiatric: Mood, memory, affect and judgment normal.

**Results:**
**Lab Results**

| Component | Value | Date |
|---|---|---|

1/10/2021                            MyChartPLUS - Visit Summary

| | | | |
|---|---|---|---|
| TSH | 4.01 | 01/04/2021 |
| TSH | 2.23 | 07/16/2020 |

No results found for: FREET4, THYROGLB, THYROGLB

Assessment

---
**Assessment & Plan**
---

**1. Type 2 diabetes mellitus with hyperglycemia, without long-term current use of insulin (HCC)**

**2. Essential hypertension, benign**

**3. Mixed hyperlipidemia**

**1. Type 2 diabetes mellitus with hyperglycemia, without long-term current use of insulin (HCC)**
diagnosed age 22
Type 2 Diabetes: Loss of control while stressed, dietary noncompliance. Continue current regimen for now and continue with diet and exercise. He does not want to add on any medications at this time since his medical care will be taken over by the prison system in 2 weeks. Get back on track with diet. My recommendations today are as follows:
-Continue metformin 1000 mg twice daily
-Continue Januvia 100 mg daily
-Continue Glipizide 5 mg- 4 tab daily. If having lows, he may try cutting back on dose.

Weight management: Recommended decreased caloric intake and exercise
Aspirin therapy: continue asa
Smoking status: nonsmoker
Renal assessment: No history of diabetic nephropathy. negative urine
Foot assessment: low risk. Patient educated with regards to diabetic foot care.
Eye assessment: History of retinopathy. Patient instructed to have yearly dilated eye exams.
Dr. Spector- 9/2018

**2. Essential hypertension, benign**
continue current anti hypertensive medications. Need for low salt diet discussed.

**3. Mixed hyperlipidemia**
Continue Crestor

Powlimi J Soni, MD
**Answers for HPI/ROS submitted by the patient on 1/7/2021**
Diabetes problem
Diabetes type: type 2
MedicAlert ID: No
Disease duration: 53 years
foot paresthesias: Yes
weight loss: Yes
Symptom course: worsening
blackouts: No
hospitalization: No
nocturnal hypoglycemia: No
required assistance: No
required glucagon: No
CVA: No
heart disease: No
impotence: No
nephropathy: No
peripheral neuropathy: Yes
PVD: No

retinopathy: No
CAD risks: family history
Current treatments: oral agent (triple therapy)
Treatment compliance: all of the time
Home blood tests: 1-2 x per day
Home urines: <1 x per month
Monitoring compliance: good
Blood glucose trend: increasing steadily
breakfast time: 6-7 am
breakfast glucose level: 110-130
High score: >200
Weight trend: stable
Current diet: diabetic
Meal planning: calorie counting
Exercise: every other day
Dietitian visit: No
Eye exam current: Yes
Sees podiatrist: No

MyChart® licensed from Epic Systems Corporation © 1999 - 2020

Name: James T Booth I DOB: 3/28/1945 I MRN: 2003772484 I PCP: Charles P Cochran, MD

# Message Center

Powlimi J Soni, MD
01/11/2021 09:05 AM

letter

**Patient's Name:** James T Booth     **MRN:** 2003772484     **D.O.B:** 3/28/1945

 

Hartford HealthCare Medical Group Endocrinology Norwalk
761 Main Avenue
Norwalk CT 06851-1080
Phone: 203-838-4000
Fax: 203-845-9535

January 8, 2021

To Whom It May Concern:

I have been Mr. Booth's endocrinologist since 2013 and I most recently evaluated him on January 8, 2021. Mr Booth has Type 2 Diabetes since the age of 21, over 50 years ago. His diabetes is uncontrolled. His most recent HgA1c is 8.3 which is above the recommended reading of 7.0. The CDC has identified Type 2 diabetes as a significant risk factor for increased risk of severe illness and death from the COVID-19 virus. In addition, Mr. Booth is 75 years old which is an additional risk factor for more severe COVID-19 related complications.

Due to the increasing number of COVID-19 cases in the country and the lack of the availability of an effective vaccine or treatment at this time, it is my professional opinion that it would be extremely harmful to his health to place him in a prison population.

Based on Mr. Booth's age and health profile, I strongly suggest that an alternative to incarceration in a correctional facility should be entertained if at all possible.

Please let me know if you need any additional information or have any questions.

Sincerely,

Powlimi J Soni, MD


Patient:     **James T Booth**
Date of Birth: **3/28/1945**


Electronically Signed by: Powlimi J Soni, MD



# U.S. Medical Center for Federal Prisons
1900 W. Sunshine Street
Springfield, MO 65807
417-874-1621

**Federal Bureau of Prisons**

*** Sensitive But Unclassified ***

| | | |
|---|---|---|
| **Name** BOOTH, JAMES | **Facility** FCI Otisville | **Collected** 08/30/2021 11:17 EDT |
| **Reg #** 87217-054 | **Order Unit** C02-041L | **Received** 09/01/2021 10:58 EDT |
| **DOB** 03/28/1945 | **Provider** Jayne  VanderHey-Wright, PA-C | **Reported** 09/01/2021 14:31 EDT |
| **Sex** M | | **LIS ID** 210212582 |

## CHEMISTRY

| Glucose | H | 343 | 74-106 | mg/dL |
|---|---|---|---|---|

## HEMOGLOBIN A1C

| Hemoglobin A1C | H | 12.5 | <5.7 | % |
|---|---|---|---|---|

5.7 - 6.4 Increased Risk
> 6.4 Diabetes

---

**FLAG LEGEND**    L=Low    L!=Low Critical    H=High    H!=High Critical    A=Abnormal    A! =Abnormal Critical



# U.S. Medical Center for Federal Prisons
**Federal Bureau of Prisons**
1900 W. Sunshine Street
Springfield, MO 65807
417-874-1621

*** Sensitive But Unclassified ***

| | | |
|---|---|---|
| **Name** BOOTH, JAMES | **Facility** FCI Otisville | **Collected** 06/29/2021 09:13 EDT |
| **Reg #** 87217-054 | **Order Unit** D03-301L | **Received** 06/30/2021 11:34 EDT |
| **DOB** 03/28/1945 | **Provider** Alphonso Linley, MD | **Reported** 06/30/2021 15:46 EDT |
| **Sex** M | | **LIS ID** 168213057 |

## HEMATOLOGY

| | | | | |
|---|---|---|---|---|
| White Blood Cell Count | | 6.3 | 4.3-11.1 | K/uL |
| NRBC% | | 0.0 | | % |
| RBC | | 4.47 | 4.46-5.78 | M/uL |
| Hemoglobin | | 13.7 | 13.6-17.6 | g/dL |
| Hematocrit | L | 40.0 | 40.2-51.4 | % |
| MCV | | 89.5 | 82.5-96.5 | fL |
| MCH | | 30.6 | 27.1-34.9 | pg |
| MCHC | | 34.3 | 33.0-37.0 | g/dL |
| RDW-CV | L | 11.6 | 12.0-14.0 | % |
| Platelet Count | | 184 | 130-374 | K/uL |
| MPV | H | 11.7 | 6.9-10.5 | fL |
| Neutrophils % | | 45.4 | | % |

Therapeutic decision making should be based on absolute values, rather than percentages

| | | | | |
|---|---|---|---|---|
| Lymphocytes % | | 40.7 | | % |
| Monocytes % | | 9.1 | | % |
| Eosinophils % | | 4.0 | | % |
| Basophils % | | 0.6 | | % |
| Immature Granulocytes % | | 0.2 | 0.0-5.0 | % |
| Neutrophils # | | 2.9 | 1.9-6.7 | K/uL |
| Lymphocytes # | | 2.6 | 1.3-3.7 | K/uL |
| Monocytes # | | 0.6 | 0.3-1.1 | K/uL |
| Eosinophils # | | 0.3 | 0.0-0.5 | K/uL |
| Basophils # | | 0.0 | 0.0-0.1 | K/uL |
| Immature Granulocytes # | | 0.01 | 0.00-0.50 | 10^3/uL |

## HEMOGLOBIN A1C

| | | | | |
|---|---|---|---|---|
| Hemoglobin A1C | H | 11.5 | <5.7 | % |

5.7 - 6.4 Increased Risk
> 6.4 Diabetes

## HEPATITIS

| | | |
|---|---|---|
| Hepatitis B Surface Antigen | Non-Reactive | Non-Reactive |
| Hepatitis B Surface Antibody QL | Negative | Negative |
| Hepatitis B Core Ab Total | Non-Reactive | Non-Reactive |
| Hepatitis C Antibody | Non-Reactive | Non-Reactive |

**FLAG LEGEND**   L=Low   L!=Low Critical   H=High   H!=High Critical   A=Abnormal   A!=Abnormal Critical

# EXHIBIT F

3/1/22, 11:14 AM    Letter to the Speaker of the House of Representatives and President of the Senate on the Continuation of the National Emergency…

Case 1:19-cr-00699-JGK   Document 48   Filed 04/01/22   Page 37 of 37

BRIEFING ROOM

# Letter to the Speaker of the House of Representatives and President of the Senate on the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic

FEBRUARY 18, 2022 • STATEMENTS AND RELEASES

Dear Madam Speaker: (Dear Madam President:)

Section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)) provides for the automatic termination of a national emergency unless, within 90 days prior to the anniversary date of its declaration, the President publishes in the *Federal Register* and transmits to the Congress a notice stating that the emergency is to continue in effect beyond the anniversary date.  In accordance with this provision, I have sent to the *Federal Register* for publication the enclosed notice stating that the national emergency declared in Proclamation 9994 of March 13, 2020, beginning March 1, 2020, concerning the coronavirus disease 2019 (COVID-19) pandemic, is to continue in effect beyond March 1, 2022.

There remains a need to continue this national emergency.  The COVID-19 pandemic continues to cause significant risk to the public health and safety of the Nation.  More than 900,000 people in this Nation have perished from the disease, and it is essential to continue to combat and respond to COVID-19 with the full capacity and capability of the Federal Government.

Therefore, I have determined that it is necessary to continue the national emergency declared in Proclamation 9994 concerning the COVID-19 pandemic.

Sincerely,

JOSEPH R. BIDEN JR.